IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LINCOLN LOAN CO.,

                     Plaintiff,                           CV-06-711-ST

      v.                                    OPINION AND ORDER

JIMMY BROWN, LORAINE FISCHER, and the
CITY OF PORTLAND,

                     Defendants.

STEWART, Magistrate Judge:

**INTRODUCTION**

Plaintiff, Lincoln Loan Co. ("Lincoln Loan"), filed this action against the City of Portland

("the City") and its employees, Jimmy Brown ("Brown") and Loraine Fischer ("Fischer"), for

damages and injunctive relief under 42 USC § 1983 arising out of inspection of a residence for

housing code violations. The Complaint alleges that defendants violated Lincoln Loan's rights:

(1) under the Fourth Amendment not to be subjected to unreasonable searches of its property;

and (2) under the Due Process Clause of the Fourteenth Amendment not to be subject to

1 - OPINION AND ORDER

inspections carried out in violation of the procedures set forth in Chapter 29 of the Portland City Code ("PCC").  Lincoln Loan has since withdrawn its claim for violation of the Fourteenth Amendment and concedes that Brown has qualified immunity and that the City of Portland has no liability.  Thus, the only remaining claim is against Fischer for damages for violating the Fourth Amendment.

This court has original jurisdiction over the federal statutory claims under 28 USC § 1331.  Both parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Both parties have filed Motions for Summary Judgment.  For the reasons that follow, defendants' Motion for Summary Judgment (docket # 14) is granted, and Lincoln Loan's Motion for Summary Judgment (docket # 25) is denied.

## FACTS

### I.    The Property

Lincoln Loan is an Oregon corporation that owns various rental residential properties in the City of Portland, including the residential property at 4331 NE 86th Avenue, Portland, Oregon ("the property").

The property was rented by George King for a number of years until his death sometime in the fall of 2003.  Wilde Depo, p. 39.  Lincoln Loan was aware that George King's son, Joseph King ("King"), also lived on the property, but George King was responsible for the rent and maintenance of the house.  *Id* at 42.  After George King's death, King informed Lincoln Loan that his father had died, that he had left him some money, and that he was interested in buying the property.  *Id* at 42-43.  Although asked how much he wanted to pay for the property and how

he intended to pay for it, he never made a firm offer. *Id* at 43. King continued to live on the property, but after he ceased paying rent, Lincoln Loan started an eviction process towards the end of 2003. *Id.* On April 20 or 21, 2004, Lincoln Loan evicted King from the property with police assistance and changed the locks. *Id* at 44.

On May 7, 2004, Lincoln Loan sold the property to Al McVay ("McVay") on a land sale contract. The land sale contract made McVay responsible for any liens or fines associated with the property. Manlove Affidavit, Exhibit 3. Lincoln Loan and McVay orally agreed that Lincoln Loan would continue to have access to the property to let King move the rest of his belongings off the property. Wilde Depo, p. 27. To that extent, Lincoln Loan retained a key to the front door of the house. *Id* at 37. McVay also had a key to the house because he wanted to start taking measurements and decide what repairs and changes needed to be made. *Id* at 46. With supervision from Lincoln Loan, King was present on the property at least three times during May and June of 2004 for the sole purpose of removing his personal belongings. *Id* at 44-45.

## II.    **Complaints About the Property**

The City, through its City Council, has enacted PCC Title 29, Property Maintenance Regulations. The purpose of Title 29 is, in part, to protect the public's health, safety and welfare by establishing and enforcing minimum standards for residential structures related to basic equipment, facilities, as well as the maintenance of outdoor areas and adjacent rights of ways to residential structures. PCC 29.05.020.

From December 2003 until December 2005, Brown was the Director of the City's Office of Neighborhood Involvement ("ONI"). Brown Affidavit, ¶ 2. In July 2003, ONI was the bureau overseeing the Neighborhood Inspection Team, whose Housing and Nuisance inspectors

implement and enforce PCC Title 29.  *Id* at ¶ 3.  The City employed Fischer as a Housing and

Nuisance Inspector from November 1994 until October 2004.  Her job duties included enforcing

Title 29.  Fischer Affidavit, ¶ 1.

On or before Wednesday, May 19, 2004, Fischer received a complaint from a citizen

concerning the presence of rats, cars, car parts, overgrown grass and "junk" all over the property,

as well as peeling paint and broken windows.  *Id* at ¶ 2; Fischer Depo, p. 13.  She then received

at least one, possibly two other complaints about the property.  Fischer Depo, p. 19.

III.    **First Visit to the Property**

On Thursday, May 20, 2004, Fischer went to the property and pulled into the driveway.

She had difficulty finding it because the numerical address was obscured from the street.  A

property whose address cannot be seen from the street violates PCC 29.30.010.  Fischer

Affidavit, ¶ 3.

From the driveway, Fischer heard a dog barking and growling.  A "beware of dog" sign

was posted on the fence.  She waited for a response from a person inside the house.  When no

one came out, she approached the house on the adjacent lot immediately to the south.  Fischer

spoke with an adult woman, who appeared to be the mother of several small children, and a

teenage girl.  The mother confirmed the presence of rats on the property and told Fischer that she

was afraid to let her children outside.  Fischer Depo, p. 17.  She gave Fischer permission to enter

her property and walk along the north boundary.  Fischer Affidavit, ¶ 4.

While walking along the neighbor's boundary line, Fischer observed the following

violations of PCC Title 29 on the property: deteriorated exterior siding (PCC 29.30.060(a));

peeled exterior paint exposing bare wood (PCC 29.30.060(b)); boarded up windows (PCC

29.30.090(a, b, c, f)); portions of a fireplace chimney removed (apparently without any permit) (PCC 29.30.040); trash and debris accumulated over the exterior property area (PCC 29.30.140(a)).  Fischer saw each of these violations without looking over the privacy fence that ran along part of the border between the two properties.  *Id* at ¶ 5.

## IV.    **Second Visit to the Property**

The next day, Friday, May 21, 2004, Fischer returned to the property.  When she arrived, three men and a woman were gathered around the property's front driveway.  Fischer identified herself as a Housing and Nuisance Inspector from the City and asked whether any of them was the owner or lived on the property.  One of the men responded affirmatively.  *Id* at ¶ 6; Fischer Depo, pp. 25, 30.  He was drinking a beer in the driveway and offered Fischer a beer.  Fischer Depo, p. 30.  The others left and Fischer told the man that there had been complaints about the property.  *Id* at 31.  The man explained that his father had owned the property, had lived there for 15 years, and had recently died, and that "he was there taking care of what he believed to be his property."  *Id*; Fischer Affidavit, ¶ 6.  Fischer did not ask the man for his name and could not remember whether he volunteered it.  Fischer Depo, p. 72.

As Fischer and the unidentified man spoke in the front area of the house, she noticed an electrical cord running from an open window of the house to a panel truck on the street.  The man explained he was staying in his truck parked in front of the property because it was too emotionally painful for him to stay inside the house.  Fischer Affidavit, ¶ 7; Fischer Depo, p. 31.  Fischer told him that it was against City Code to run permanent power from the house to the truck, and he immediately unplugged it by pulling the cord out of the window.  Fischer Affidavit, ¶ 7; Fischer Depo, pp. 31-32.

The man told Fischer that he was the neighborhood mechanic, that everybody loved him, that he had been helping people for a long time, and that he did not understand why people were calling and complaining about the property after his dad had died. Fischer Depo, p. 32. Fischer explained there were problems with the property and offered to point them out if the man showed her around the property. The man agreed to allow Fischer on the property. Fischer Affidavit, ¶ 11; Fischer Depo, p. 32.

Fischer noticed an iron structure over the driveway. The man said that he used the structure as an engine hoist to repair vehicles. Fischer explained that in a residential area, the City Code prohibited major auto repair, that disabled vehicles were not allowed on the property, and that he was not allowed to sleep in his car. She suggested that the man go to a trailer park, stay with friends, or stay inside the house. He repeated he could not stay inside the house because it was too painful. Fischer Affidavit, ¶ 8; Fischer Depo, pp. 32-33.

Near the engine hoist, Fischer observed several household items along the side of the house. Fischer Affidavit, ¶ 10. The man explained that these were his or his dad's and he was "cleaning things up." Fischer Depo, pp. 56, 67. He offered to sell Fischer a set of golf clubs, telling her the clubs had belonged to his father, and she declined. Fischer Affidavit, ¶ 10; Fischer Depo, p. 33.

As Fischer and the man were touring the property, a large dog was following the man. Fischer asked the man if he would put the dog in the house. Fischer Depo, p. 33. A chain link fence separated the driveway from the side of the house and the backyard. Fischer Affidavit,

Exhibit 1, p. 1, photo A,  p. 2, photo E.[1]  Fischer saw the man use a key to open a side door along

the south side of the house, behind the fence at the top of the driveway.  *Id* at photo E.  The man

put the dog in the house, pulled the side door shut, and locked it with a key.  Fischer Affidavit,

¶ 9; Fischer Depo, p. 33.

The man and Fischer walked clockwise around the structure as Fischer noted various

violations.  Fischer Affidavit, ¶¶ 14-15.  One such violation was the presence of the shell of an

old car in the backyard and other disabled vehicles on the street.  The man assured Fischer that

"I'll get that taken care of."  Fischer Depo, pp. 33-35.  He said he was hopeful about cleaning

everything up and that he wanted to bring his teenage daughter up from Southern Oregon to live

on the property with him.  Fischer Affidavit, ¶ 12; Fischer Depo, pp. 37-38.  They continued to

the north side of the house, where the man wanted to show Fischer an area covered in vegetation

that had become a dumping ground for him and his neighbors.  *Id*.  She started to follow him, but

felt unsafe so she told him that she did not need to see it, and they came back.  *Id* at 35-36.

The sequence of the events that followed is highly disputed by the parties.

A.    **First Version**

Initially in her deposition, Fischer described that by the time she refused to follow the

man to the dumping ground, she had written down "*most* of the violations on the nuisance."  *Id* at

36 (emphasis added).  She showed the man the nuisance posting, which contained language that

one has 15 days to take care of the violations or a $300 fine would be levied and placed as a lien

against the property.  *Id*.  He became concerned and asked who would bear responsibility for the

fines.  She explained that the property owner is responsible for them, and he responded that his

---

[1]  Whether the fence is a partial or a gated fence is disputed and unclear from the pictures.

dad owned the property. *Id* at 36-37. In Fischer's perception, "you could see that he's sort of juggling in his mind that he's the heir, is what he implied. But then he's starting to get agitated with the fact that he would have to pay money." *Id* at 37. Fischer explained that as long as the violations were fixed, this would not be a problem. *Id*. In response, the man revealed for the first time: "Well, if I'm not the owner then I think that they should take – be forced – why haven't they been forced to do repairs?" *Id* at 36-37. At this point, Fischer realized that "there is somebody else besides him, that is involved in this situation. It's just not a dad dies and leaves the house and I've inherited it." *Id* at 37.

The man started pressing her to see the conditions inside the house and invited her to come down into the basement, which she refused. *Id* at 38. He opened the door, possibly by unlatching it because the hardware on the basement door was missing, and held the door open as he went inside. *Id*. Fischer did not follow him into the structure, but was able to take a look inside and take pictures by using the zoom function of her digital camera; she noted that the stairs were in really bad shape, there were no handrails, insulation was hanging down, and the structural support system was being buttressed by new wood. *Id* at 39.

After photographing the basement, Fischer gave the man a list of *all* the things that needed to be fixed, along with the housing maintenance and notice of violation, and the man became more agitated. *Id*. When the man asked who would be responsible, Fischer explained that under the city code, whoever was in charge of the property on the Multnomah County Assessment and Taxation records would typically be held responsible for making the corrections. *Id* at 39-40. She told him that she was not a lawyer, but "there are times – for example, when a tenant, in their contract of living at a site, will say on the contract that they agree to take care of

the lot and the outside of the house," and that if "the tenant doesn't take care of it, the property

owner has to take care of it." *Id* at 40.

      **B.**      <u>**Second Version**</u>

      Towards the end of her deposition, Fischer was asked to clarify the sequence of the

statements made by the man. She explained that at the time the man opened the door leading

down to the basement, he had yet to say anything that suggested to her that he was not the owner.

*Id* at 69-70. After Fischer photographed the basement, the man invited her to go into the house

and "see the conditions that him and his dad had to live under. And that's when he used that they

had to fix that, that they'll be responsible." *Id* at 70. Fischer did not go into the house. *Id* at

70-71.

**V.**      <u>**Subsequent Events**</u>

      After leaving the property, returning to the office and writing everything out, Fischer

became concerned that "since [the man] had said that he stayed there, that he was the owner, that

he implied that he was the heir" and then "he later said that there was someone else, or some

other entity involved here," the property was "basically a vacant property." *Id* at 40-41, 53.

      PCC requires housing inspectors to send notice of housing violations to the person or

business whose name and address are listed on the county tax assessor's records. PCC

26.60.050; Toni Anderson Affidavit, Exhibit 1, p. 6. In 2004, Lincoln Loan was listed as the

owner of the property on the Multnomah County Assessment and Taxation records. On May 31,

2004, Fischer sent Lincoln Loan a Notice of Violation with an enclosed List of Violations.

Fischer had seen nine out of 14 listed violations either from the neighboring property on May 20,

or from the public right-of-way, the property's driveway, or front porch on May 21. Fischer

Affidavit, ¶ 36; Benson Affidavit, Exhibit 2.  Fischer learned that Lincoln Loan had an interest in the property at the time she sent the Notice of Violation.  Fischer Depo, p. 63.

Fischer returned to the property on June 8, 2004.  The man who had showed her around on May 21, 2004, was there and invited her onto the property.  Fischer Affidavit, ¶ 24.  During that inspection, Fischer took photographs documenting the Title 29 violations previously noted in the Notice of Violations.  *Id*.  Several of these photographs were taken from the street, the property's driveway, or the property's front porch, but some were taken from the backyard and the northeast side of the property.  *Id* at ¶¶ 25, 26.

On July 2, 2004, Fischer returned to the property.  At that time, she believed the property was vacant.  Fischer "red-tagged" the property, by posting a notice on the front window.  *Id* at ¶ 28.  A red tag notice prohibits occupation of a residence until the Title 29 violations are corrected, or approval is given by the inspector to re-occupy the property.  *Id*; Marihart Affidavit, ¶ 4.  During that last visit to the property, Fischer went to the property's driveway and front porch, and nowhere else.  Fischer Affidavit, ¶ 29.  She took photographs depicting the continuing Title 29 violations, and saw two rats and holes along the south side of the property, next to the structure consistent with rat infestation.  Fischer called Multnomah County Vector Control with information concerning the rat problem.  *Id* at ¶ 30.

Pursuant to PCC 29.70.010(A), the City charges a penalty in the form of a monthly enforcement fee for each property found in violation of Title 29, provided that the property is subject to the notice provisions of the PCC and has been out of compliance for 30 days.  The amount of the monthly enforcement fee is determined according to the Property Maintenance Regulations Fee Schedule, which has been developed by the City Auditor.  Marihart Affidavit,

¶ 5.  Any single violation listed on the List of Violations developed by Fischer would have supported the amount of the monthly code enforcement fee the City imposed on the property.  *Id* at ¶ 7.

Lincoln Loan never used the administrative process available to it under Title 29 to challenge or appeal the findings of PCC violations or the imposition of penalties or liens on the property.  Wilde Depo, pp. 25-26.

McVay defaulted on the land sale contract with Lincoln Loan in the fall of 2005, in part because of his failure to keep the property free of governmental liens.  *Id* at 28.  Lincoln Loan paid the property taxes on the property in 2004.

## LEGAL STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

**DISCUSSION**

Lincoln Loan alleges that Fischer violated its rights under the Fourth Amendment not to be subjected to unreasonable searches of its property. The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." The basic purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court of City and Cty. of San Francisco*, 387 US 523, 528 (1967). The officials may be building inspectors whose purpose may be to locate and abate a suspected public nuisance. *Michigan v. Tyler*, 436 US 499, 504-05 (1978) (citation omitted). One governing principle of the Fourth Amendment is that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara*, 387 US at 528-29 (citations omitted).

I.     **Reasonable Expectation of Privacy**

Fischer was able to observe several of the Title 29 violations from a vantage point in the neighbor's yard, without looking over any privacy fence, as well as from the street, the property's driveway and front porch. With regard to these violations, Lincoln Loan had no reasonable expectation of privacy and no Fourth Amendment claim. However, Fischer observed other violations in the curtilage of the house, not visible from the public access areas of the property,

namely violations in the backyard, the north side of the house, and the basement. As a threshold

issue, Fischer contends that Lincoln Loan had no reasonable expectation of privacy with regard

to these areas because any right it had to control the property after it sold it to McVay was for the

limited purpose of allowing King, whom Lincoln Loan had evicted, to gather and remove his

personal property. This court concludes that a disputed issue of material fact precludes summary

judgment for Fischer on this issue.

A.    **Legal Standard**

The determination of whether a person has a reasonable expectation of privacy involves

two inquiries: (1) whether the party has exhibited an actual, subjective expectation of privacy;

and (2) whether that expectation is one that society is prepared to recognize as reasonable.

*United States v. Pollock*, 726 F2d 1456, 1465 (9th Cir 1984) (citation omitted). However, an

"intent to maintain privacy does not necessarily establish a constitutionally protected area of

privacy." *United States v. Van Damme*, 48 F3d 461, 464 (9th Cir 1995).

A person may have a legitimate expectation of privacy in a place he does not own.

*United States v. Reyes*, 595 F2d 275, 278 (5th Cir 1979). The owner of a property generally loses

any expectation of privacy once the owner rents or sells the property to another person.

*Schneider v. County of San Diego*, 28 F3d 89, 91-92 (9th Cir 1994), *cert denied*, 513 US 1155

(1995). However, a person "who enters into an arrangement that indicates joint control and

supervision" of a place that is searched may challenge the search. *Pollock*, 726 F2d at 1465

(citation omitted).

In determining the reasonableness of a legitimate expectation of privacy, the court must

examine how "public" the area is. Although the Fourth Amendment does not reach open fields,

the expectation of privacy extends to the curtilage of a house, an area which "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 US 294, 301, *reh'g denied*, 481 US 1024 (1987) (internal quotation marks and citations omitted).  Four factors are used to analyze whether an area is within the curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the residents to protect the area from observations by people passing by. *Id*.  The Supreme Court specifically cautioned lower courts not to apply these factors in a mechanical fashion.  *Id*.  Given the considerations cited in *Dunn*, the determination of a curtilage is fact specific and varies from case to case.

Observations made by government officials from a front porch or driveway do not violate the Fourth Amendment.  *See United States v. Garcia*, 997 F3d 1273, 1280 (9th Cir 1993) ("officers walking up to the front door of a house can look inside through a partially draped open window without conducting Fourth Amendment search"); *United States v. Orozco*, 590 F2d 789, 792 (9th Cir 1979) ("visual observation by a law enforcement officer situated in a place where [she] has a right to be is not a search within the meaning of the [F]ourth [A]mendment") (citations omitted).

**B.    Analysis**

The parties dispute to what extent Lincoln Loan retained possession and control of the property after the sale to McVay on May 7, 2004.  Lincoln Loan and McVay agreed to share possession and control of the property for however long it took for King to remove his belongings or for King's belongings to be deemed legally abandoned.  This agreement was made

in an effort to comply with ORS 90.425, which forbids landlords from storing, selling, or disposing personal property left on premises by former occupants except in accordance with certain specified procedures, including taking reasonable steps to safeguard personal property left behind by former occupants.  Although the agreement was an oral understanding and not memorialized in the land sale contract, both parties acknowledge its existence.  *See* Wilde Depo, p. 100; McVay Affidavit, p. 2 ("it was agreed that I would share possession of the property with Lincoln Loan Company for as long as it took to get Joseph King's personal property removed.  During that time both of us would have keys and access to the property").  Either McVay or a Lincoln Loan representative could come to the property at any time and unlock the door to permit King to remove his personal effects.  Both Lincoln Loan and McVay had keys to the house.

Fischer believes that according to this oral understanding, Lincoln Loan became a bailee or constructive bailee for King's personal property.  Because the violations in the basement concerned the structural integrity of the building's foundation and had nothing to do with King's personal effects, she argues that Lincoln Loan had no legitimate, reasonable expectation of privacy in the basement area.  In support of this contention, she relies on *Schamaeizadeh v. Cuningan*, 338 F3d 535, 544-45 (6th Cir 2003), 541 US 1041 (2004), which granted a police officer's motion for summary judgment against a plaintiff's Fourth Amendment search claim because the plaintiff had rented the area searched (a basement) to other persons and, thus, had no reasonable expectation of privacy.

*Schamaeizadeh* offers little guidance here.  Both Lincoln Loan and McVay agree that Lincoln Loan had joint possession of the property until King removed his belongings or his personal effects were deemed legally abandoned.  While the parties clearly agreed as to the

duration of their joint possession, the extent of the joint possession (and consequently the expectation of privacy resulting from it) presents a factual issue.

Whether Lincoln Loan's right to protect King's belongings extended to protecting the *structure* of the basement from intruders depends on what the parties understood to be the extent of Lincoln's right to "joint possession." King had belongings in the basement area. Lincoln Loan had boarded up the door to the basement in an attempt to keep him out, had to remove the board in order to allow King to retrieve his personal property from the basement, and screwed the board back in place at the end of the day. Thus, Lincoln Loan had taken significant steps to protect the basement from intruders and to protect King's belongings from intruders. Wilde Depo, pp. 46, 50. Neither McVay's nor Wilde's testimony answer whether a Lincoln Loan representative standing in the front yard of the property would have had the right to tell Fischer she was not allowed on the property.[2] Therefore, a fact issue exists whether Lincoln Loan had a reasonable expectation of privacy in the backyard and basement of the property.

## II.    Actual Injury

Next, Fischer argues that even if part of her inspection violated the Fourth Amendment, Lincoln Loan cannot recover any damages because it suffered no actual injury. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 US 299, 307 (1986) (citation omitted) (§ 1983 plaintiff "could recover compensatory damages only if he proved actual injury caused by the denial of his constitutional rights."); *see also Heck v. Humphrey*, 512 US 477, 487 n7 (1994) (citation omitted) ("[i]n order to recover compensatory damages, however, the section 1983 plaintiff must

_____

[2] At oral argument, Lincoln Loan also argued that it had a secured interest in the property because it had loaned McVay the funds necessary to purchase the property. However, Lincoln Loan has cited no case law indicating that secured creditors of real property have a reasonable expectation of privacy on that property.

prove not only that the search was unlawful, but that it caused him actual, compensable injury . .

.").

The monthly enforcement fee the City charged Lincoln Loan in the form of a lien would have been the same for a single violation as for all 14 of the violations identified by Fischer. As a result, Fischer argues that the amount of compensatory damages would have been the same even if Fischer had only assessed the violations she observed from the street, driveway, front porch, and neighboring property which did not violate the Fourth Amendment.

Lincoln Loan responds that had the Notice of Violations not included the basement violations, the remaining violations could have been corrected within approximately one week without much expense. As a result, the violations would have been timely remedied, avoiding any lien. The record contains some evidence to support Lincoln Loan's position.

According to McVay, he did not have sufficient time or money available to complete the work in the basement and did not remedy all the other violations because the basement repairs were the most expensive and "there was no point to doing some of the repairs unless they were all going to be completed, since the full amount of the monthly assessments would continue until every listed item had been repaired." McVay Affidavit, p. 6. The basement violations include:

> 9. **Permit Required**: Stairs are unsafe to use, with deteriorated, damaged and/or missing treads and risers. 29.30.070
> 10. Common stairway and basement access stair rails are incomplete, of insufficient size and/or lack returns. 29.30.080(b, c)
> 12. **Permit Required**: Structural members in the basement have been added without permit. 29.30.050(b).

Benson Affidavit, Exhibit 2.

Discussing violations 9, 10 and 12, McVay stated that the basement "had significant problems because the basement wall had deteriorated and was collapsing into the basement,

which destroyed the existing stairway and threatened the structural support of the house above."
McVay Affidavit, p. 5.  In order to remedy the violations, "[r]estoring the foundation wall and
replacing the stairway was work that required permits and drawings," would have cost an
estimated $12,000 to $15,000, and would have required "at least 6 to 8 weeks of continuous
work."  *Id*.

At oral argument, Fischer noted that the violations do not address the foundation of the
wall.  However, violation 12 regarding the use of structural members without a permit may be
related to problems with the basement's foundation wall, potentially justifying the cost estimated
by McVay.

When presented with a Notice of Violation, an owner has 30 days to correct the violations
or else a "lien will be placed on the property and monthly Code Enforcement Fees will be
assessed.  Should this case remain open for 6 (six) months or more, the monthly charges will
increase to twice the original amount."  McVay Affidavit, Exhibit 2.  The Notice of Violation
informed that a code violation fee of $134.20 would be added "every month until the Office of
Neighborhood Involvement inspects and finds this property free and clear of code violations."
Manlove Affidavit, Exhibit 5, p. 1.[3]  The "lien will remain in full force and effect until the
property is no longer in violation of the City Code AND this account is paid in full."  *Id*.

Thus, the monthly enforcement fees would continue until *all* the violations were
corrected.  Based on the record, the amount of time needed to remedy the basement violations
may well have taken longer than the amount of time needed to address the violations visible from

---

[3]  The City imposed a $134.20 fee for the first month.  For the next four months, the fee was $99 fee plus $3.20
monthly billing charge, plus monthly interest.  Thereafter, the code enforcement fee was doubled to $198.00 (plus monthly
billing charge and monthly interest) until August 2006, when the case was closed.  Marihart Affidavit, ¶ 6.

public areas (the street, driveway, neighbor's yard). Normally, structural damage involves more time and resources than esthetic repairs. There is some evidence that McVay would have remedied the other violations quickly and without much cost *but for* the basement violations. Thus, Lincoln Loan may well have suffered an actual injury from the City's lien based on the additional violations discovered in non-public areas such as the basement. This is a factual issue that cannot be decided on summary judgment.

## III. **Consent**

The last issue presented by the parties is whether the unidentified man (now identified as King) had the necessary authority to consent to Fischer's search of the non-public areas of the property. The undisputed facts reveal that he did have that authority, thus entitling Fischer to summary judgment.

### A. **Legal Standard**

Where the validity of a search rests upon consent, the government has the burden of proving that the necessary consent was obtained. *Florida v. Royer*, 460 US 491, 497 (1982) (plurality opinion) (citations omitted); *LaDuke v. Nelson*, 762 F2d 1318, 1329 (9th Cir 1985), *amended by* 796 F2d 309 (9th Cir 1986) (citation omitted). "A third party's consent to the search of another's property is valid if the consenting party has either actual or apparent authority to give consent." *United States v. Ruiz*, 428 F3d 877, 880 (9th Cir 2005) (citation omitted). "A third party has actual authority to consent to a search of [property] if the owner of the [property]

has expressly authorized the third party to give consent or if the third party has mutual use of the [property] and joint access or control over [it]." *Id* at 880 (citation omitted).[4]

Apparent authority is present if: (1) the searching officer believed "some untrue fact that was then used to assess the extent of the consent-giver's use of and access to or control over the area searched;" (2) it was objectively reasonable under the circumstances to believe that the fact was true; and (3) "assuming the truth of the reasonably believed but untrue fact," the consent-giver would have had actual authority. *Id* at 880-81 (citation omitted). "Apparent authority is measured by an objective standard of reasonableness, and requires an examination of the actual consent as well as the surrounding circumstances." *Id* at 881 (citation omitted). "Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Illinois v. Rodriguez*, 497 US 177, 188 (1990). The issue is whether "'the facts available to the officer at the moment [of entry] 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Id* at 182 (citation omitted). The apparent authority doctrine applies only to reasonable mistakes of fact, not to mistakes of law. *Ruiz*, 428 F3d at 881 (citation omitted).

B.    **Analysis**

The parties disagree as to whether Fischer believed an untrue *fact* which she relied on to assess the extent of the unidentified man's use of and access to or control over the area searched.

---

[4] Where the claim is one of an unreasonable search under Article I, Section 9 of the Oregon Constitution, a third party must have actual authority to give a valid consent to justify the search. *See State of Oregon v. Ready*, 148 Or App 149, 152-53 & n 4, 939 P2d 117, 120 & n4 (1997), citing *Lincoln Loan Co. v. City of Portland*, 138 Or App 688, 691, 909 P2d 1243, 1244, *rev denied*, 323 Or 136, 916 P2d 311, *cert denied* 519 US 966 (1996) and *State v. Will*, 131 Or App 498, 504, 885 P2d 715, 719 (1994) ("Although apparent authority is now sufficient under the Fourth Amendment, *see Illinois v. Rodriguez* [supra], actual authority to grant consent is still required under Article I, section 9.") (citations omitted). Here, the only claim is under the Fourth Amendment, rather than under Article I, Section 9 of the Oregon Constitution.

20 - OPINION AND ORDER

They also disagree on whether it was objectively reasonable under the circumstances to believe that the fact was true and whether, assuming the truth of the reasonably believed but untrue fact, the unidentified man would have had actual authority.

      1.    **Untrue Fact**

Lincoln Loan contends that the apparent authority doctrine does not apply because Fischer's belief that the unidentified man could give a valid consent was based on a mistake of law, not on an untrue fact. "A mistaken belief as to the law, no matter how reasonable, is not sufficient." *United States v. Welch*, 4 F3d 761, 764-65 (9th Cir 1993), *receded from on other grounds by United States v. Kim*, 105 F3d 1579 (9th Cir 1997) (citations omitted).

Before *any* consent to search was given, the man told Fischer that his father had owned the property, had recently died, and that he was taking care of what he believed to be his property. Fischer understood the man's statements to describe a situation where a "dad dies and leaves the house and I've inherited it." Fischer Depo, p. 37. The man never told her whether his father's estate had been admitted to probate or whether there had been a distribution of his property. Lincoln Loan believes that Fischer's interpretation of the man's words represents a mistake of law rather than a reasonable reliance on an untrue fact because she reached the legal conclusion that the son became the owner of the property after his father's death in the absence of clear proof.

As an example of the kind of proof that Fischer should have obtained, Lincoln Loan relies on *United States v. Hunyady*, 409 F3d 297, 308 (6th Cir), *cert denied*, 546 US 1067 (2005). In that case, the personal representative of the estate consented to the search of a house whose owner had died and provided the police with a deed showing the decedent's ownership, the will,

and a letter of authority from the probate court appointing him as personal representative. Similarly, Lincoln Loan argues that Fischer should have asked whether there was a probate of the deceased owner's estate and whether the man had received ownership of the house as part of a distribution from his father's estate.

However, the personal representative in *Hunyady* never claimed to be a resident of the property nor did he claim ownership to various items on the property. In contrast, the unidentified man represented to Fischer that he had been living on the property before his father died, that his father had been the owner, and that he was taking care of what he believed to be his property. Had he lived on his father's property before his father's death, he would have been a sub-tenant of his father's and, either in that capacity or as a holdover tenant, would have had actual authority to give consent for the search. Thus, in conducting the search, Fischer relied on the untrue facts that the man's father had owned the property and that he had resided there with his father and continued to reside there.

At some point during the search (the timing of which is highly contested), the man revealed to Fischer that he might not be the owner. Under one version of the facts, Fischer viewed and documented the basement violations *after* the man revealed he was not the owner. Even then, he continued to claim that he lived there and complained about the living conditions inside the house. He never revealed that he was a trespasser who had been evicted. In continuing to conduct the search *after* finding out that the man was not the owner, Fischer relied on the untrue fact that the man still had some right to live there.

///

///

22 - OPINION AND ORDER

2.    **Objective Reasonableness**

a.    **Public Access Areas**

Fischer observed various violations from public access areas such as the street, front yard, and driveway.  These visual observations are not searches within the meaning of the Fourth Amendment because they were made from a place where Fischer had a right to be, without the necessity of consent.  *Orozco*, 590 F2d 789, 792 (9th Cir), *cert denied*, 439 US 1049, and *cert denied*, 442 US 920 (1979) (citations omitted).  Those violations do not underlie this dispute.

b.    **Curtilage**

A chain link fence separated the driveway from the side of the house and the backyard. While the parties dispute whether the fence was a partial or a gated fence, the area behind the fence was clearly within the curtilage of the house due to its proximity to the house, its inclusion in the enclosure surrounding the house, and the nature of the side yard and backyard as areas traditionally associated with the sanctity of one's home and the privacies of life.  *See Dunn*, 480 US at 300-02.  The violations within the curtilage form the basis of this dispute.

i.    **Information Gathered Before Entering Curtilage**

Before entering the curtilage of the house, Fischer reasonably relied on information she observed or obtained in public access areas.  At the time of her arrival, three men, one woman, and a dog were gathered around a car in the driveway of the property.  One man told Fischer that he lived at the property, stayed behind with his dog when the others left, represented that he had come back to live with his father who owned the property and had recently died, and said that he was taking care of the property.  When Fischer saw an electrical cord running from an open window of the house to a panel truck on the street, the man admitted that he was living in his

truck because it was too emotionally painful for him to stay inside the house.  He also told

Fischer that he was the beloved neighborhood mechanic, had been helping people for a long

time, and did not understand why people were calling and complaining about the property after

his father had died.

Lincoln Loan urges that a person of reasonable caution would not have relied upon a

stranger's assertion to be the owner of the property without further inquiry because the existence

of a consent to a search is a fact not to be inferred lightly.  *United States v. Reid*, 226 F3d 1020,

1025 (9th Cir 2000) (citations omitted).  In *Reid*, the court found it was not objectively reasonable

to presume that a man who answered the door lived in the apartment.  The officers knew from

their extensive investigation the identity of one of the persons who resided at the apartment and

knew that the person who answered the door was not him.  The person who answered the door

did not know whose car was consistently parked in the space assigned to the apartment, a further

indication that he did not live there.  Finally, the name of the person who answered the door was

not one of the names listed on the lease documents in the officers' possession.  In contrast,

Fischer had no prior knowledge about who was the owner, resident, or lessee of the property

before she inspected it and unlike *Reid*, the man here seemed very familiar with the property.

The mere fact of access, without more, does not indicate that the access was authorized.

*United States v. Dearing*, 9 F3d 1428, 1430 (9th Cir 1993), *disapproved on other grounds by*

*Kim*, 105 F3d 1079.  Relying on *Kaspar v. City of Hobbs*, 90 F Supp 2d 1313, 1319 (D NM

2000), *appeal dismissed*, 32 Fed Appx 521 (10th Cir 2002), Lincoln Loan argues that it was

unreasonable for Fischer to rely on the man's mere presence on the property.  In *Kaspar*, the

court found that no reasonable person would have relied on the consent of a man standing in the

doorway of the house, who gave his first name and, when asked whether he lived there, answered that he "stays there sometimes, taking care of the lady that lives in the house."  The fact that the man failed to respond with a "yes" when asked if he lived there raised doubt regarding his residency there.  *Kaspar* is clearly distinguishable.  Here, in contrast, when Fischer asked whether anyone was the owner or lived on the property, the man responded affirmatively.  Sporadic visits, as in *Kaspar*, are not the same as the permanent residency claimed by the man in this case.

Lincoln Loan also contends that it was unreasonable for Fischer to rely on the man's representations given the existence of two discrepancies.  First, the man claimed that he was the beloved neighborhood mechanic, but then said that the neighbors had complained about him.  Second, Fischer understood that the man lived in the house, but the man stated that he was staying in his truck.

Neither discrepancy necessarily leads to the suspicion that the man is a mere trespasser.  The man's belief that he was loved by everyone while his neighbors bitterly complained about the property does not amount to a glaring inconsistency.  A person's self-perception can and often does vary drastically from how he is seen by others.  The second alleged discrepancy misconstrues the facts.  Fischer's description of the conversation with the man prior to the consent never mentions that he lived in the house, only that he lived on the property.  Furthermore, the man put his dog in the house with a key, indicating some use of and control over the house.

Next, Lincoln Loan argues that Fischer should have further investigated the man's status on the property as a possible vagrant because she described him as "marginally disfranchised"

(Fischer Depo, p. 66) and various household items (mattress, couch, microwave oven, clothing, futon, chairs, etc.) were scattered about the yard without shelter from the elements.

However, the man explained that the junk lying around the property belonged to him or had been his father's and that he was sorting through it and cleaning it out, and pointed out a pile of junk that he was going to haul away. This is certainly a believable explanation given that his father had just passed away. The man's appearance and demeanor as "marginally disenfranchised" do not necessarily lead to the conclusion that he did not have control of the property. Fischer described him as having a very difficult time financially, as well as emotionally with the death of his father, unable to adequately care for a parent who was dying, not knowing how to get services, unable to hold down a job, but a good citizen, very capable of speaking in sentences, not exhibiting "the typical jitters and jerks of a meth head," "relatively kept, well kept, physically." Fischer Depo, p. 66. Someone with these characteristics could conceivably be a tenant or sub-tenant of a property in disarray. The man's explanation that he lived in his truck because it was too painful to live in the house was consistent with his statement that his father had recently passed away and with Fischer's impression that he was having a hard time emotionally dealing with his father's death.

Other factors support Fischer's perception that the man did not simply have access to the property, but lived on the property and was able to give consent. When she arrived, the man was socializing with three visitors, none of whom contradicted his assertion that he lived on the property. After they left, he and his dog stayed behind. The previous day, Fischer had observed a dog barking behind the fence and a sign on the fence warning "beware of dog." The electrical cord running from an open window in the house to the truck suggested that the man had access to

26 - OPINION AND ORDER

the house.  In addition, an iron structure that the man used as an engine hoist to repair vehicles was placed in the driveway.  This was consistent with the man's claim to be a mechanic and with the presence of disabled vehicles.

Early in the inspection, the dog barked and Fischer asked the man to put the dog in the house before they proceeded with the inspection.  The man had a key to the side door of the house which he displayed when Fischer asked him to put the dog away.  He unlocked the side door and locked the dog inside the house.  The side door was behind a chain link fence (potentially a partial fence), but may have been visible from the driveway.  It is difficult to ascertain whether Fischer considered this fact in evaluating the reasonableness of the man's consent.  Fischer's affidavit places this event *before* the consent, while the deposition is unclear. Regardless of whether Fischer observed the side door key before or after stepping into the curtilage of the house, the other circumstances were sufficient for Fischer to form a reasonable belief that the consent was valid.

### ii.     Basement

Lincoln Loan contends that any belief by Fischer in the truthfulness of the statements made to her by the man when he consented to a search of the premises simply disappeared before her search of the basement.  Lincoln Loan argues that Fischer received information that someone else might be the owner of the house *before* she viewed the basement.  As discussed above, Fischer's deposition contains two versions about the sequence of events, raising a question of fact as to whether the violations in the basement were observed before or after the man revealed that someone else might be the owner.

Even assuming the sequence of events most favorable to Lincoln Loan, Fischer still reasonably believed that the man had authority to give consent. After the man revealed that he might not be the owner, he continued to represent that he lived on the property. In response to his revelation that he might not be the owner, Fischer explained that while the property owner is normally responsible for paying the fines and making the necessary repairs, there are times when a tenant agrees to take care of the property in the rental contract and only if the tenant does not take care of it, then the property owner is responsible. The circumstances observed by Fischer may reasonably support a conclusion that the man lived there as a tenant, even though he was not the owner. This is evidenced by: (1) after telling Fischer that someone else might own the property, his insistence on showing her the deplorable living conditions that he and his father had endured; (2) the visitors who did not contradict his statement that he lived there; (3) the dog who accompanied him, consistent with Fischer's previous observation of a dog barking in the fenced yard and a "beware of dog" sign; (4) his possession of a key to the side door; (5) access to the inside of the house to plug in an electrical cord, suggesting that the electricity had not been turned off; (6) the hoist in the driveway, consistent with the man's representation that he was a mechanic and with the presence of disabled vehicles on the lot; (7) his statement that he hoped to bring his teenage daughter from southeast Oregon to live with him on the property; (8) his familiarity with the property and neighborhood, including the lot where all the neighbors dumped garbage; and (9) the lack of any concern expressed by the neighbors in their complaints that the property was vacant.

///

///

28 - OPINION AND ORDER

3.      **Actual Authority**

Lincoln Loan next argues that even assuming the truth of the reasonably believed but untrue facts, the man would not have had actual authority.  The man represented to Fischer that he had lived on what he believed to be his property.  Even if he was not the heir, the man represented that he had been living there since before his father's death.  As such, he would have been a sub-tenant of his father's and would have had actual authority to give consent for the search.  After the man revealed that he was not the owner, he continued to claim that he lived there.  Thus, if what he claimed had been true, he could have been considered a holdover tenant. Either as a holdover tenant or as a sub-tenant, the man would have had actual authority to consent to the search.

4.      **Conclusion**

In conclusion, the test for apparent authority is met here and the consent, and therefore the search, were valid and did not violate Lincoln Loan's Fourth Amendment rights.[5]

**IV.   Qualified Immunity**

Because this court has determined that Fischer did not violate the Fourth Amendment based on the valid consent given by King to search the property, it need not address Fischer's qualified immunity defense.

///

///

_____

[5] Fischer returned to the property on June 8, 2004, to reinspect the Title 29 violations she had previously noted.  The man who had given her consent to search the property on May 21, 2004, was there and invited her onto the property.  The record indicates that before June 8, 2004, Fischer had begun to suspect that the property was vacant, had learned that Lincoln Loan had an interest in the property, and had sent Lincoln Loan a Notice of Violations.  However, Lincoln Loan does not challenge the validity of this subsequent search.

29 - OPINION AND ORDER

## <u>ORDER</u>

For the reasons stated above, defendants' Motion for Summary Judgment (docket # 14) is

GRANTED, and Lincoln Loan's Motion for Summary Judgment (docket # 25) is DENIED.

DATED this 13th day of June, 2007.

   /s/
Janice M. Stewart
United States Magistrate Judge
